# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

INGRAM BARGE COMPANY, LLC, )
                                                 )
**Plaintiff,** )
                                                 )
**v.** )         **Case No. 3:19-cv-01030**
                                                 )         **Judge Aleta A. Trauger**
**BUNGE NORTH AMERICA, INC.,** )
                                                 )
**Defendant.** )
                                                 )

## MEMORANDUM

Bunge North America, Inc. ("Bunge") has filed a Motion to Dismiss and/or to Transfer Venue (Docket No. 14), to which Ingram Barge Company, LLC ("Ingram") has filed a Response (Docket No. 18), Bunge has filed a Reply (Docket No. 19), and Ingram has filed a Sur-Reply (Docket No. 24). For the reasons set out herein, Bunge's motion will be granted in part and denied in part.

## I. BACKGROUND

Bunge is a New York corporation with its headquarters in Missouri. It "originate[s], process[es], and transport[s] agricultural commodities, including soybeans, corn and grain byproducts." (Docket No. 15-1 ¶¶ 3, 5.) Bunge routinely works with SCF Marine, Inc. ("SCF"), which Bunge characterizes as the "exclusive provider of barge freight for Bunge's dry bulk grain and grain-related products along the Mississippi River and other waterways." (*Id.* ¶ 7.) In that capacity, "SCF procures transportation for Bunge on barges owned or contracted by SCF through the barge freight market." (*Id.* ¶ 8.) It does so pursuant to an ongoing "Contract of Affreightment" between the two entities. (*Id.* ¶ 9.) Bunge has informed the court that it considers the terms of that contract to be proprietary and confidential, and no copy of the contract has been filed with the

court. (*Id.* ¶ 11.) Ingram has provided email correspondence between its personnel and SCF personnel, in which SCF personnel appear to be relaying Bunge's position on freight contracts to Ingram. (Docket No. 18-1 at 5–12 (ex.1).)

Ingram is a river freight company based in Tennessee. This case involves 26 shipments of grains purchased by Bunge from various sellers and carried by Ingram barges to Louisiana, where Bunge received them. The freight for 21 of those 26 shipments was arranged for by SCF pursuant to its ongoing relationship with Bunge ("SCF Shipments"). The other 5 shipments ("Non-SCF Shipments") were purchased by Bunge from grain sellers on a "CIF" basis—that is, "cost, insurance, freight," also known as "delivered"—meaning that the seller was responsible for paying the charges for transporting the grain from its point of origin to the buyer's point of receipt.[1]. (Docket No. 15-1 ¶¶ 14–15.)

Ingram used a version of its standard bill of lading for the jobs. "A bill of lading is 'the basic transportation contract between the shipper-consignor and the carrier.'" *Great W. Cas. Co. v. Flandrich*, 605 F. Supp. 2d 955, 964 (S.D. Ohio 2009) (quoting *S. Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 342 (1982)). "A bill of lading has three purposes: (1) it records that a carrier has received goods from the party that wishes to ship them; (2) it defines the terms governing the carriage; and (3) it serves as evidence of the contract for carriage." *CSX Transp., Inc. v. Meserole St. Recycling*, 618 F. Supp. 2d 753, 765 (W.D. Mich. 2009) (citing *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18–19 (2004)).

In its most simplified form, a bill of lading defines the relationship of three parties—the consignor, the consignee, and the carrier—although it is possible for one entity to serve in more than one of those capacities. The consignor is the shipper—the party arranging for the goods to be

_____

[1] In contrast, commodities can also be purchased on an "origin" basis, meaning that the buyer must arrange to transport the commodity to the desired location.

2

shipped. *See Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.*, 513 F.3d 949, 954 (9th Cir. 2008). The consignee is "[t]he person named in the bill of lading as the person 'to whom or to whose order the bill promises delivery." *Paper Magic Grp., Inc. v. J.B. Hunt Transp., Inc.*, 318 F.3d 458, 461 (3d Cir. 2003) (quoting U.C.C. § 7-102 (2002)). The carrier is the party that carries the goods from where they can be found to where they are received. *See* Saul Sorkin, 1 Goods in Transit § 1.02 (2019) ("Carriers of goods, in addition to their description by mode, such as motor carriers, rail carriers, carriers by water, sea or air are also designated by other terms such as common carrier, private carrier, contract carrier, non-vessel operating common carrier, freight forwarder, consolidator, or dispatcher."). The bill is "issued by the carrier to the shipper at the time goods are loaded aboard ship . . . . The shipper sends the bill of lading to the intended recipient of the goods (consignee); upon notification that the goods have arrived, the consignee presents the bill to the carrier at the delivery port, and receives the goods in return." *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 92 n.1 (1st Cir. 1993).

The bill of lading for each SCF Shipment lists the consignor as "BUNGE NORTH AMERICA." The consignee is identified as "ORDER OF BUNGE NORTH AMERICA." "BUNGE NORTH AMERICA" is also listed as the "notify" party—that is, a party to be informed when the freight arrived. These bills of lading have signature blocks for Ingram and Bunge, but only Ingram's includes an actual signature, that of an Ingram representative. (*See, e.g.*, Docket No. 1-3 at 2.) The Non-SCF Shipments list the original grain seller as both the consignor and consignee, with Bunge listed only as the "notify" party or, in one case, not listed at all. Like the other bills of lading, these have signature blocks for Ingram and the consignor, but only Ingram has had a representative sign. (*See, e.g.*, Docket No. 1-103 at 2.)

Each bill of lading relevant to this case included the following language:

It is mutually agreed, as to each carrier of this property over all or any portion of said route, and to each party at any time interested in all or any part, of said property, that every service to be performed hereunder is (or will be deemed) subject to Carrier's Grain Transportation Terms which are posted on Carrier's webpage at www.ingrambarge.com/graintransportationterms.pdf . . . ; any Consignee hereto is (and will be deemed) bound by Carrier's Grain Transportation Terms.

(E.g., 1-3 at 2.) The Grain Transportation Terms are a separate document available from Ingram or Ingram's website. They consist of 36 detailed items covering issues related to the carriage of grain and the relationships of the related parties, including the following paragraph:

> **28. Choice of Law and Forum:** This Contract is governed by the General Maritime Law of the United States and to the extent not inconsistent therewith, the laws of the State of Tennessee, both as to interpretation and performance. Any dispute arising from this Contract, the applicable bill of lading, or the performance of Carrier or Shipper's obligations under either this Contract or the applicable bill of lading must be brought in the U.S. District Court for the Middle District of Tennessee. Each party hereby irrevocably waives any objection to personal jurisdiction or venue therein. Each party also waives its right to a trial by jury.

(Docket No. 1-2 at 4.) The Grain Transportation Terms purport to bind "[a]ny entity that places an order for transportation of heavy grains, soybeans in bulk, (or any combination thereof) with" Ingram, as well as "any entity that causes the loading of such a cargo into [Ingram's] barges or that holds the bill of lading covering cargo transported in [Ingram's] barges." (*Id.* at 2.) The Terms state that the grain seller and grain purchaser are jointly and severally obligated to fulfill all of the contractual obligations of the "Shipper," which the Terms define to include both "the entity ordering the cargo transportation and the owners of the cargo (including any consignee(s))." (*Id.*)

Ingram has provided a Declaration by its Director of Agriculture and Dry Bulk Sales, Matt Tomayko, in which Tomayko discusses the bills of lading. (Docket No. 18-1.) Tomayko explains that "[i]t is not normal for bills of lading to be signed by the cargo owner," because "[s]ignatures are neither customary nor feasible when a particular bill of lading may be negotiated multiple times

4

as the related cargo sails down river or over the sea." (*Id.* ¶ 11.) Tomayko also offers the following

explanation of the significance of the various fields listed on the bill of lading:

> Ingram's standard bill of lading contains several fields, including: (1) "Transportation Ordered By," which identifies the Seller; (2) "Consigned To," which identifies the Seller's first consignee of the cargo; and, (3) "Notify," which identifies the ultimate consignee and receiver of the cargo. At times, the "Notify" field identifies multiple companies. In such cases, the first name listed is the ultimate consignee, receiver, and owner of the cargo. The other names listed, typically after "A/C," meaning "on account of," are companies in the consignment chain, but who are not the ultimate consignee, receiver, and owner of the cargo.

(*Id.* ¶ 4.) Accordingly, pursuant to Tomayko's characterization of the terms, "[a]ll of the bills of

lading contained in Ingram's complaint were ultimately consigned to Bunge," including for the

Non-SCF Shipments, despite Bunge's not being listed as consignee on those bills. (*Id.*)

> Tomayko describes his dealings with SCF as follows:

> I routinely engage in commercial dealings with a company called SCF; on information and belief, SCF is a company closely connected with Bunge that purchases all of Bunge's barge freight. On numerous occasions where I engaged in negotiations surrounding barge freight contracts with SCF, SCF has represented to me that SCF needs to obtain approval from Bunge before agreeing to a particular term or set of terms. Based on these interactions, I understand SCF to be acting as Bunge's agent; in other words, in dealing with SCF, I understand that I am also dealing with Bunge. . . . In fact, on many occasions involving Ingram barges transporting cargo pursuant to contracts with SCF, it is Bunge—and not SCF—that contacts Ingram to make inquiries about the status of particular barges. Based on these inquiries, I understand that Bunge receives reports from SCF on the status of barges transporting goods pursuant to contracts of affreightment between Ingram and SCF.

(*Id.* ¶¶ 5, 7.) On April 22, 2019, Tomayko sent an email to SCF providing a link to the Grain

Transportation Terms. (*Id.* at 13 (ex. 2).)

Bunge received all 26 shipments in Louisiana, on May 4, 2019 or thereafter.. (Docket No.

15-1 ¶ 15; Docket No. 1-59 at 2.) Over the course of the shipping, however, Ingram allegedly

incurred costs that, it argues, Bunge is ultimately liable to pay, as one of the parties defined by the

Grain Transportation Terms as the "Shipper." Bunge paid demurrage charges—penalties related

5

to delayed loading or unloading of goods, *see CSX Transp. Co. v. Novolog Bucks Cty.*, 502 F.3d 247, 250 (3d Cir. 2007)—for at least some of the shipments, but Bunge maintained it was not liable for the unrelated expenses that Ingram incurred *en route*. (Docket No. 18-1 ¶ 10.)

On November 18, 2019, Ingram filed its Complaint against Bunge. (Docket No. 1.) In the Complaint, Ingram alleges that Bunge "did not pay the third-party marine service providers for shifting, fleeting, and wharfage services provided to the barges carrying its cargo after they were placed or constructively placed by Ingram pursuant to the Grain Transportation Terms." (*Id.* ¶ 16.) Count I of the Complaint is for breach of contract. Count II is for unjust enrichment. Count III is a claim for declaratory judgment, seeking a declaration that the bills of lading and Grain Transportation Terms form a valid and enforceable contract between Ingram and Bunge. (*Id.* ¶¶ 202–09.)

On January 13, 2020, Bunge filed a Motion to Dismiss and/or to Transfer Venue. (Docket No. 14.) Bunge argues that this court lacks jurisdiction over it, that venue is improper, and that Ingram has failed to state a claim on which relief can be granted. (*Id.* at 1.)

## II. LEGAL STANDARD

### A. Motion to Dismiss for Lack of Personal Jursidiction

In considering a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), a court has three options. It may (1) rule on the motion on the basis of the affidavits and materials submitted by the parties, (2) permit discovery in aid of the motion, or (3) conduct an evidentiary hearing on the merits of the motion.[2] *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998). It is in the court's discretion, based on the circumstances of the case, which path to choose. *Id.* In any proceeding, however, the party asserting jurisdiction has the burden of proof.

---

[2] Neither party has requested a hearing in this case.

6

*See Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). "Additionally, in the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

When a court rules on a motion to dismiss for lack of personal jurisdiction based upon the affidavits or other preliminary materials, the party asserting jurisdiction need only make a *prima facie* showing of jurisdiction to defeat the motion. *Theunissen*, 935 F.2d at 1458. In examining whether the party asserting jurisdiction has made this *prima facie* showing, the court is to construe the facts presented in the light most favorable to that party, and the court does not weigh or consider the conflicting facts presented by the other side. *Bird*, 289 F.3d at 871; *see also Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360-61 (6th Cir. 2008) (referring to the plaintiff's burden in this context as "relatively slight").

**B. Motion to Dismiss or Transfer Based on Improper Venue**

Under Fed. R. Civ. P. 12(b)(3), a defendant may move to dismiss a case for improper venue. On such a motion, it is the plaintiff's burden to show that venue is proper. *Gone to the Beach, LLC v. Choicepoint Servs.*, 434 F. Supp. 2d 534, 537–38 (W.D. Tenn. 2006). If the district court finds that the case is "in the wrong division or district" the court "shall dismiss" the case, or, "if it be in the interest of justice," the court may transfer the case "to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

**C. Request for Discretionary Transfer in the Interests of Justice**

Under 28 U.S.C. § 1404(a), a district court may, "[f]or the convenience of parties and witnesses, in the interest of justice, . . . transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). When considering a section 1404(a)

7

motion to transfer, "a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991) (citation omitted). The Sixth Circuit has suggested that relevant factors to be considered include: (1) the convenience of the parties and witnesses; (2) the accessibility of evidence; (3) the availability of process to make reluctant witnesses testify; (4) the costs of obtaining willing witnesses; (5) the practical problems of trying the case most expeditiously and inexpensively; and (6) the interests of justice. *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). Unless the balance of these factors strongly weighs in favor of the defendant seeking transfer, "the plaintiff's choice of forum should rarely be disturbed." *Id.* (citations omitted).

## D. Motion to Dismiss for Failure to State a Claim

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

8

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## III. ANALYSIS

### A. General Principles of Personal Jurisdiction

In order for this court to exercise personal jurisdiction over a non-resident defendant, such as Bunge, the defendant must have "certain minimum contacts with the [forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Supreme Court has identified "general" jurisdiction and "specific" jurisdiction as distinct grounds for personal jurisdiction. *Id.* at 417-18. General jurisdiction allows the court to "exercise jurisdiction over any claims a plaintiff may bring against the defendant," whereas specific jurisdiction "grants jurisdiction only to the extent that a claim arises out of or relates to a defendant's contacts in the forum state." *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678–79 (6th Cir. 2012) (citing *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997)).

"The 'paradigm' forums in which a corporate defendant" will be subject to general jurisdiction "are the corporation's place of incorporation and its principal place of business," with

9

general jurisdiction available elsewhere only in "exceptional" cases. *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1552 (2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 136 (2014)). It is undisputed that Bunge is neither incorporated in nor headquartered in Tennessee, and Ingram does not allege that Bunge is subject to the court's general personal jurisdiction.

The assertion of specific jurisdiction "depends on an affiliation between the forum and the underlying controversy," such as an "activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Walden v. Fiore*, 571 U.S. 277, 284 n.6 (2014) (internal quotation and citation omitted). Ingram has not demonstrated any connection between this district and Ingram's dealings with Bunge other than the forum selection clause in Ingram's Grain Transportation Terms. Whether the court has personal jurisdiction over Bunge will, therefore, come down to whether that clause provides an adequate basis for exercising jurisdiction.

**B. Forum Selection Clause—SCF Shipments**

The Sixth Circuit has recognized that parties may, through a forum selection clause, "agree in advance to submit to the jurisdiction of a particular court." *Preferred Capital, Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006) (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)). That rule arises from the premise that the right not to be subject to a particular court's personal jurisdiction is a "waivable right," and a party may, therefore, "consent to the personal jurisdiction of a particular court system" that otherwise would not have jurisdiction. *Id.* (quoting *Kennecorp Mortg. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.* 610 N.E.2d 987, 988 (1993)). Bunge does not dispute the legal principle that a party could voluntarily submit to this court's jurisdiction. Bunge argues, however, that it has not consented to the jurisdiction of this court, because the underlying agreements with regard to the SCF Shipments were between SCF and Ingram.

10

On their face, however, the bills of lading describe a relationship between Bunge, as consignor/consignee, and Ingram, as the carrier—not a relationship between Ingram and SCF. Moreover, Bunge does not dispute that it took possession of the bills of lading for the shipments it received. Accordingly, at least after the first SCF Shipment, Bunge was aware that it was being named as the consignor for the SCF-arranged shipments. Bunge protests that no representative for it signed the bills of lading. The lack of a signature, however, does not inherently render a contract invalid or non-binding. For example, under Tennessee law, "[w]hen a contract between two parties which is contemplated to be signed by both is reduced to writing and signed by only one of them, but accepted by the other, it becomes in contemplation of the law, a written binding contract on both." *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 350 (Tenn. Ct. App. 1999) (citations omitted); *see also Staubach Retail Servs.–Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 525 (Tenn. 2005) ("When a party who has not signed a contract demonstrates its assent by performing pursuant to the contract and making payments conforming to the contract's terms, that party is estopped from denying the binding effect of the contract."). Federal maritime law embraces the same general principle. *See Sea-Land Serv., Inc. v. Landis*, No. CIV. A. 94-6153, 1996 WL 4120, at *3 n.8 (E.D. Pa. Jan. 3, 1996) ("It is axiomatic that an offeree is bound by the terms of a contract upon providing a reasonable manifestation of his acceptance of the contract.").

Maritime law, like ordinary contract law, requires a contract to be based on a "meeting of the minds" shown through an objective "manifestation of mutual assent." *Knox Energy, LLC v. Gasco Drilling, Inc.*, 738 F. App'x 122, 124 (4th Cir. 2018) (quoting *Wells v. Weston*, 326 S.E.2d 672, 676 (Va. 1985)). Once Bunge was aware of the form of the bills of lading for the SCF shipments, it—as a sophisticated entity that routinely ships grain—should have known that it would be treated as the consignor under the bills, regardless of the fact that it was arranging for

the freight through an intermediary. The fact that Bunge continued to receive the shipments under those bills of lading, rather than, for example, instructing SCF to have itself identified as the consignor, is an objective manifestation that it accepted that it would be bound in the ordinary manner of a consignor itself.

The forum selection clause, of course, was not on the bill of lading, but in the Grain Transportation Terms. The bills, however, unambiguously incorporate those terms, in language prominently placed alongside the rest of the bills' key information. "[U]nder admiralty law— which generally follows the common law of contracts in resolving maritime contract disputes— maritime contracts may validly incorporate terms from a website in the same manner that they may incorporate by reference terms from paper documents" *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 269 (5th Cir. 2011). The "chief consideration" in such a situation "is whether the party to be bound had reasonable notice of the terms at issue." *Id.* (citing *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236–37 (E.D. Pa. 2007)). It is questionable whether Bunge had reasonable notice of the Grain Transportation Terms when it first received a shipment under one of these bills of lading.[3] Thereafter, however, the notice was adequate on its face.

Bunge argues that, regardless of what the bills of lading said, it never manifested assent to the bills, because it refused to pay the charges that Ingram sought. That argument might be persuasive if Ingram had been identified solely as the consignee on the bills. The consignee, as a third party, will not be bound by a bill of lading unless the consignee takes some step demonstrating acceptance of the bill's terms, as the court will discuss in more detail in the next section. Bunge,

---

[3] Ingram argues that Bunge should be treated as having notice of the contents of the Grain Transportation Terms when Ingram informed SCF. The record, however, does not contain enough information about Bunge's relationship with SCF to impute the notice given to SCF to Bunge. Moreover, merely knowing about the Grain Transportation Terms would not mean that Bunge knew that SCF was arranging for Bunge to be the consignor on the shipments.

12

however, was also identified as the consignor/shipper on the bills. The shipper is not some third party; it is (along with the carrier) one of the two contracting parties without which a bill of lading would be meaningless as a legally enforceable agreement. As a non-third party, Bunge did not require some additional step of acceptance to be bound to bills on which it was, with notice, identified as the shipper.

Finally, Bunge argues that, even if the Grain Transportation Terms are applicable to it, the court should hold that the forum selection clause is unenforceable. As a general rule, a forum selection clause is *prima facie* valid and is enforceable unless it is shown to be unfair or unreasonable. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972); *see Wong v. PartyGaming Ltd.*, 589 F.3d 821, 828 (6th Cir. 2009) (explaining that a "forum selection clause should be upheld absent a strong showing that it should be set aside") (citing *Carnival Cruise Lines v. Shute*, 499 U.S. 585 (1991)); *Security Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 375 (6th Cir. 1999)(discussing *Zapata*, 407 U.S. at 10). In order for a forum selection provision to be unreasonable and unjust, the moving party must show that the forum for which the parties contracted is "so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *Zapata*, 407 U.S. at 18. Bunge has not met that high bar. The court has little doubt that it would be more convenient for Bunge if this case were litigated in the Eastern District of Louisiana. Bunge, however, is a large, sophisticated entity that functions in many states. It is no doubt capable of having its day in court in the Middle District of Tennessee.

The court therefore holds that, at least with regard to all of the SCF Shipments other than the first, Bunge consented to personal jurisdiction in this district. The court will return to that shipment in the later section of this Memorandum addressing pendent personal jurisdiction.

## C. Forum Selection Clause—Non-SCF Shipments

Unlike the bills of lading for the SCF Shipments, the bills of lading for the Non-SCF Shipments do not identify Bunge as the consignor. Indeed, they do not even identify it as the consignee, but rather merely a "notify" party, if anything. The consignors and consignees for those bills of lading are, at least according to the bills themselves, the grain sellers from whom Bunge purchased grain on a CIF/delivered basis. Ingram nevertheless argues that LDC consented to jurisdiction in this court with regard to the Non-SCF Shipments, because it ultimately accepted and received the grain that was shipped under the bills.

"Although a bill of lading is a contract between a shipper and a carrier, it can nonetheless bind a non-party buyer where there is consent to be bound*." Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 696 F.3d 647, 655 (7th Cir. 2012) (citation omitted). Most commonly, courts have held that "[a] non-party buyer may accept the terms of the bill of lading where it files a lawsuit under the bill, and attempts to benefit from its terms." *Id.* (citing *Steel Warehouse Co. v. Abalone Shipping Ltd.*, 141 F.3d 234, 237 (5th Cir.1998)); *see also Flying Phoenix Corp. v. Creative Packaging Mach., Inc.*, 681 F.3d 1198, 1201 (10th Cir. 2012); *Kukje Hwajae Ins. Co. v. M/V Hyundai Liberty*, 408 F.3d 1250, 1254 (9th Cir. 2005); *APL Co. Pte. v. Kemira Water Sols., Inc.*, 890 F. Supp. 2d 360, 366 (S.D.N.Y. 2012); *Taisheng Int'l Ltd. v. Eagle Mar. Servs., Inc.*, No. Civ. A. H–05–1920, 2006 WL 846380, at *3 (S.D. Tex. Mar. 30, 2006); *Anchor Seafood, Inc. v. CMA-CGB (Caribbean), Inc.*, No. 05-23097-CIV, 2005 WL 4674292, at *2 (S.D. Fla. May 4, 2005). Bunge, of course, did not bring this suit and has not sought to legally enforce any provisions of the bills of lading or the Grain Transportation Terms with regard to the Non-SCF Shipments. Ingram argues that Bunge nevertheless agreed to be bound by those bills of lading when it supposedly became what Ingram refers to as the "ultimate consignee" of the grain.

The bills of lading themselves, however, clearly establish that the grain sellers were both the consignors and consignees. Although Ingram attempts to rely on the Tomayko Declaration to give the "notify" designation some meaning other than its facially apparent one, the concept of a "notify" party as distinct from the consignee is well-established. The Supreme Court considered the issue well over a century ago, in *North Pennsylvania Railroad Co. v. Commercial National Bank of Chicago*, 123 U.S. 727 (1887), in which it considered a claim based on the improper delivery of cattle to the party designated "Notify" rather than the party designated "Consigned to" in the relevant bill. *Id.* at 729. As the Court observed, status as a "notify" party is inherently distinct from being the consignee; otherwise, "the direction to notify [that party] would be entirely unnecessary, because the duty of the carrier is to notify the consignee on the arrival of goods at their place of destination" regardless. *Id.* at 736. Although Ingram attempts to give the impression that its standard bill of lading is some specialized form that requires a Declaration for the court to understand the full depths of its meaning, its party designations are essentially the same as those that were used by the *North Pennsylvania Railroad* parties. It is clear that, based on long-established and widely understood freight terminology, the grain sellers, not Bunge, were the consignees under the bills of lading for the Non-SCF Shipments.

The designation of the grain sellers as consignees is consistent with Bunge's characterization of its expectations under the purchase contracts. According to Bunge, it paid the price necessary to purchase the grain on a CIF basis, putting the responsibility for paying for transport on the sellers. It makes sense, then, that the sellers would be the consignees. "[C]onsignee status is more than a mere designation. The term takes on a legal significance due to the quasi-contractual relationship that arises between the consignee and the carrier." *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1281 (11th Cir. 2009). Designating the grain sellers as both consignors

15

and consignees ensured that they took full responsibility for the carrier relationship, which, according to Bunge, is what it paid for.

Even assuming that the bills of lading, combined with the Grain Transportation Terms, demonstrate a desire to draw the circle of bound parties more broadly than the traditional definitions would contemplate—for example, by reaching any "party at any time interested in all or any part" of the transported goods or by defining "Shipper" to include numerous parties other than the actual shipper—that attempt would run afoul of the principle that "[a] party cannot unilaterally employ definitions to bind another by provisions to which the other has not consented to be bound." *United States v. Waterman S.S. Corp.*, 471 F.2d 186, 189 n.4 (5th Cir. 1973) (discussing broad definition of "shipper" in bill of lading); *see also In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 72 (S.D.N.Y.) (discussing meaning of the term "shipper"). Bunge did not negotiate the Non-SCF Shipments' bills of lading, agree to the bills of lading, take on responsibilities under the bills of lading, or accept the designation of "consignee" under the bills of lading; all it did was accept the grains and receive their bills of lading, which were marked "prepaid" and which, on their face, did not hold Bunge to the role of consignee. "[A] present or future ownership interest in the goods" being shipped alone, however, is not "sufficient . . . to constitute acceptance of [a] Bill of Lading." *APL Co. PTE. v. UK Aerosols LTD.*, No. C 05-0646-MHP, 2006 WL 3848784, at *3 (N.D. Cal. Sept. 28, 2006).

Finally, Ingram argues that Bunge's payment of demurrage charges related to its grain shipments is evidence that Bunge accepted the requirements of the bills of lading and Grain Transportation Terms. (*See* Docket No. 1-27 (demurrage invoice).) Paragraph 16 of the Grain Transportation Terms requires the "Shipper"—defined broadly to include both the consignor and any "owners of the cargo"—to pay demurrage charges based on days that the barge sits unused

16

awaiting either loading or unloading. (Docket No. 1-2 at 2, 6.) Specifically, "for the first ten days of demurrage, Shipper shall owe Carrier $300 per barge per day, and for any additional days after the first ten days, Shipper shall owe Carrier $400 per barge per day." (*Id.* at 6.) It does appear that Bunge paid some charges incurred pursuant to those terms. Bunge's payment of demurrage charges, however, would not necessarily have been premised on its acceptance of the terms of the bills of lading. Bunge had independent relationships with and duties to the grain sellers. Bunge's payment of the demurrage charges for which the sellers would otherwise be liable can easily be explained in terms of Bunge's obligations to the sellers, not Ingram—particularly given that the accrual of demurrage charges may have been Bunge's fault. Merely pointing to the demurrage payments' existence, therefore, is not sufficient to overcome Ingram's burden to establish jurisdiction, and the court lacks sufficient context or detail to draw any inference establishing jurisdiction from the payments.

Ingram, therefore, has not carried its burden of establishing that Bunge consented to, or is otherwise subject to, the personal jurisdiction of this court pursuant to the bills of lading associated with the Non-SCF Shipments. The court can only exercise personal jurisdiction with regard to those claims, if at all, pursuant to some other basis, such as jurisdiction ancillary to the claims over which the court does have jurisdiction.

## D. Pendent Personal Jurisdiction

"Pendent personal jurisdiction . . . exists when a court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim." *United States v. Botefuhr,* 309 F.3d 1263, 1272 (10th Cir. 2002) (citations omitted); *see*

17

*also Capitol Specialty Ins. Corp. v. Splash Dogs, LLC*, 801 F. Supp. 2d 657, 667 (S.D. Ohio 2011) (acknowledging doctrine of pendent personal jurisdiction). Pendent personal jurisdiction—which is sometimes characterized as a species of supplemental jurisdiction and sometimes referred to as a distinct doctrine —"enables a court having original specific jurisdiction over a person with regard to a particular claim . . . to exercise jurisdiction over other claims involving that person for which it otherwise may not have jurisdiction, so long as the other matters 'form part of the same case or controversy.'" *i play, inc. v. Aden & Anais, Inc.*, 186 F. Supp. 3d 518, 525–26 (W.D.N.C. 2016) (quoting 28 U.S.C. § 1367); *see* Wright & Miller, 4A Fed. Prac. & Proc. Civ. § 1069.7 (discussing basis for recognizing pendent personal jurisdiction).

There is no perfect test for determining whether two claims arise from the same nucleus of operative fact. The Sixth Circuit has looked at the issue in terms of whether events are part of the same "transaction or occurrence" or "if, in the language of everyday people, they are 'logically related.'" *Lisboa v. City of Cleveland Heights*, 576 F. App'x 474, 476 (6th Cir. 2014) (quoting *Rettig Enterps., Inc. v. Koehler*, 626 N.E.2d 99, 103 (Ohio 1994)). Depending on the underlying facts, those phrases may not be much clearer than "common nucleus of operative facts." With regard to the Non-SCF Shipments, however, the requirement of a shared "transaction or occurrence" is determinative. The transactions underlying the SCF Shipments and the Non-SCF Shipments are distinct, not just as a technical matter, but in their fundamental details. The grains were sold on different terms, and the bills of lading have different parties. They were not part of the same general course of dealing as the SCF Shipments over which the court does have jurisdiction.

With regard to the first SCF Shipment, however—the one SCF Shipment for which Bunge had dubious notice of the forum selection clause—the court finds that it has pendent personal

jurisdiction, even if the consent to jurisdiction with regard to the claim based on that shipment is questionable. Although one could technically define each shipment at issue here as distinct, the SCF Shipments involve the same course of dealing between Bunge, SCF, and Ingram, the same relationships, and the same key players. It would make little sense to require that that one claim be litigated separately from the 20 others, merely because of a difference in the analysis of one party's notice. The court, therefore, will find that it has personal jurisdiction with regard to all of the claims based on the SCF Shipments, but not the claims based on the Non-SCF Shipments.

**E. Forum**

"The question—whether venue is 'wrong' or 'improper'—is generally governed by 28 U.S.C. § 1391," unless some more specific provision of law applies. *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 55 (2013). Generally, when venue is challenged, the court must determine whether the case falls within three specific categories set out in Section 1391(b). "If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under Section 1406(a)." *Atl. Marine*, 571 U.S. at 56.

Pursuant to 28 U.S.C. § 1391(b), venue is proper in

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). For the purposes of 28 U.S.C. § 1391(b)(1), a defendant business entity resides "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C.A. § 1391(c)(2). Bunge's consent

to personal jurisdiction with regard to the SCF Shipments is therefore sufficient to establish statutory venue.

**F. Discretionary Transfer**

Bunge argues next that, if this court concludes that it has jurisdiction and that venue in this district is proper with regard to any of Ingram's claims, the court should nevertheless transfer the case to the Eastern District of Louisiana pursuant to 28 U.S.C. § 1404(a). That statute provides, in pertinent part, that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). With this statute, "Congress intended to give district courts the discretion to transfer cases on an individual basis by considering convenience and fairness." *Kerobo v. Sw. Clean Fuels, Corp.*, 285 F.3d 531, 537 (6th Cir. 2002) (citation omitted).

The Supreme Court had held that "[t]he presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis." As relevant to this case, "a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests," because, "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Atl. Marine*, 571 U.S. at 64. Instead, the court "may consider arguments about public-interest factors only." *Id.* at 64.

Those factors do not justify disregarding the forum selection clause and transferring the case to Bunge's preferred jurisdiction. There is no basis for concluding that this court should alleviate any congestion of its docket by foisting work onto the Eastern District of Louisiana, and, although Louisiana may have more of a connection to this case than Tennessee, its interest is not so great as to mandate transfer. As the Supreme Court has held, "forum-selection clauses should

control except in unusual cases." *Id.* Bunge has not demonstrated that the SCF Shipments present

such an exceptional circumstance that transfer is warranted.

## G. Rule 12(b)(6)

Finally, Bunge argues that Counts II and III—for unjust enrichment and declaratory

judgment, respectively—should be dismissed based on Ingram's failure to state a claim on which

relief can be granted. Because the court has held that it has personal jurisdiction with regard to the

claims related to the SCF Shipments, the court will consider Bunge's arguments with regard to

those claims.

**1. Unjust Enrichment.** Bunge argues that Ingram does not have claims for unjust

enrichment against it because Bunge was not enriched by the underlying events. Rather, Ingram

merely received wharfage and other services from third parties, for which Ingram became liable.

Ingram, Bunge argues, is seeking to shift a preexisting liability, not recoup any improper

enrichment on Bunge's part.

"Claims for unjust enrichment are cognizable under admiralty law," and courts considering

such claims often look to ordinary state-law principles. *Cashman Scrap & Salvage, L.L.C. v. Bois*

*d'Arc Energy, Inc.*, No. CIV.A. 07-7068, 2009 WL 3150234, at *4 (E.D. La. Sept. 28, 2009) (citing

*Kane v. Motor Vessel LEDA*, 355 F. Supp. 796, 801 (E.D.La.1972)). The elements of an unjust

enrichment claim are: "1) [a] benefit conferred upon the defendant by the plaintiff; 2) appreciation

by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that

it would be inequitable for him to retain the benefit without payment of the value thereof."

*Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (citation and

internal quotation marks omitted). "Unjust enrichment is a quasi-contractual theory or is a contract

implied-in-law in which a court may impose a contractual obligation where one does not exist."

*Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998) (citing *Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 154–55 (Tenn. 1966)).

"Courts will impose a contractual obligation under an unjust enrichment theory when: (1) there is no contract between the parties or a contract has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation." *Id.* (citation omitted). "A contract cannot be implied, however, where a valid contract exists on the same subject matter." *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991). Thus, a party seeking to recover under a theory of unjust enrichment "must demonstrate ... [that] there [is] no existing, enforceable contract between the parties covering the same subject matter." *Smith v. Hi-Speed, Inc.*, 536 S.W.3d 458, 480 (Tenn. Ct. App. 2016) (citation omitted).

Plaintiffs in cases, like this one—where there is a dispute regarding whether there is a valid contract—frequently plead unjust enrichment claims in the alternative, in case the court holds that there was no contract. In order for such a claim to survive, however, the plaintiff must allege some basis for concluding that the defendant was unjustly enriched even if no contract existed. In this instance, however, the underlying contracts are the only basis for assuming that Bunge would be liable for fleeting, shifting, and wharfage charges incurred by Ingram's barges or that it would be unjust for Bunge not to pay those charges. Although Bunge did receive an indirect benefit from those services, in that the services were part of the shipping of Bunge's grain, Ingram has provided no basis for concluding that that indirect benefit would be unjust in the absence of the parties' contracts. There is, therefore, no basis for maintaining unjust enrichment as a distinct cause of action with regard to the SCF Shipments, and the court will dismiss Count II with regard to the transactions over which it is retaining jurisdiction.

22

**2. Declaratory Judgment.** Bunge argues that Ingram's declaratory judgment claim should be dismissed because Bunge seeks, not merely a declaration of the validity of the specific contracts at issue in this case (which would be addressed in Count I regardless), but a general statement of the validity of unidentified Bunge-Ingram contracts that do not provide a sufficiently concrete and definite controversy to provide the basis for declaratory relief. *See Fieger v. Mich. Supreme Court*, 553 F.3d 955, 969 (6th Cir. 2009) ("For a declaratory judgment to issue, there must be a dispute which calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts.") (quoting *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977)).

In its Response, Ingram makes no attempt to defend its claim for declaratory relief. Ingram does finally address Count III in its Sur-Reply, but it does not dispute that, insofar as it seeks a declaration of rights other than with regard to the transactions at issue in the other claims, such a request would be beyond the scope of an appropriate declaratory judgment action. The only declaratory relief that Bunge seeks, therefore, is relief overlapping entirely with the analysis that likely will be required to resolve Count I. Whether the court formally dismisses Count III is therefore an issue of little, if any, consequence. Because Ingram did eventually express a desire to pursue the claim, however, and because it has limited its request for relief appropriately, the court will not dismiss the count.

## H. Dismissal or Transfer of Claims Related to Non-SCF Shipments

Sixth Circuit and Supreme Court caselaw make clear that a district court can, in its discretion, transfer, rather than dismiss, a case where it otherwise lacks personal jurisdiction. *See Stanifer v. Brannan*, 564 F.3d 455, 458–61 (6th Cir. 2009) (discussing *Goldlawr v. Heiman*, 369 U.S. 463 (1962)). Such a decision, however, is easier when there is no doubt about what "the proper district" for the suit is. *Id.* at 458. Here, however, there may be multiple districts that would

have personal jurisdiction over the claims related to the Non-SCF Shipments, and the record does not definitively establish that venue would only be appropriate in one particular district. In light of the deference owed to the "plaintiff's choice of forum," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981), the court will dismiss the claims related to the Non-SCF Shipments without prejudice to permit Ingram to refile in the district of its choice.

## IV. CONCLUSION

For the foregoing reasons, Bunge's Motion to Dismiss or, in the Alternative, to Transfer Venue (Docket No. 14) will be granted in part and denied in part. The claims related to the Non-SCF Shipments will be dismissed without prejudice based on lack of personal jurisdiction. Count II will be dismissed with prejudice with regard to the SCF Shipments.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge